UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------X
FRANK DeCHIRICO
                        Petitioner,

                                                    **MEMORANDUM & ORDER**

        -against-
                                                    97 CV 1456

HANS WALKER, Superintendent,
                        Respondent.
--------------------------------------------------X
DEARIE, Chief Judge.

        Petitioner seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. For the reasons set

forth below, the application is denied, and the petition is dismissed.


                            **Background**

        Around 1:00 a.m. on September 14, 1988, Judith Anne Wrappe, a young Pratt Institute art

student who had just arrived in New York City, was senselessly murdered near campus on Hall

Street in Brooklyn. The case attracted significant media attention, and within days, petitioner

was arrested. The evidence at trial established that petitioner struggled with Wrappe over her

purse, shot her at close range and ran toward his home a couple of blocks away.

        Several area residents gave fairly consistent descriptions of the man they saw attack

Wrappe and flee the scene, but none was able to see petitioner's face. Felipe Morales, a

homeless crack addict who had been introduced to petitioner by a friend a week or two before the

murder, linked petitioner to the crime. Although Morales did not witness the shooting, he saw

petitioner running near Hall Street, down Willoughby Avenue toward Washington Avenue, with

a purse under his arm. Morales's description of petitioner's clothing was consistent with the

description given by those who saw the attack. His positive identification of petitioner in a line-

up led to petitioner's arrest. Wrappe's black leather purse, various personal effects and her dormitory key were recovered in the front yard of 216 Washington Avenue. Petitioner resided at 100 Washington Avenue.

Petitioner was held at Rikers Island pending trial. A few days before opening statements in petitioner's trial, Charles Brown, a Rikers Island inmate, contacted the trial prosecutor. Approximately one week later, Brown testified that petitioner made certain admissions to him at Rikers indicating that he murdered Wrappe.

Petitioner was convicted by a jury of two counts of second-degree murder (intentional and felony), first-degree robbery, and related weapons possession offenses. He was sentenced as a second felony offender[1] to concurrent prison terms of twenty-five years to life on each of the murder counts. At sentencing, the trial judge noted that the case was "probably one of the strongest circumstantial evidence cases [he had] ever witnessed in a courtroom." (Sentence Tr. 24.)

Six months after petitioner's trial, Charles Brown testified in People v. Joseph Fama, the high-profile Bensonhurst murder trial, to jailhouse admissions made by Fama. During the course of that trial, details of Brown's questionable history as a cooperator surfaced that were not brought out at petitioner's earlier trial.

Petitioner's attack on his conviction is based upon the prosecution's failure to disclose those details about Brown and a related claim that Brown's testimony was perjured. In addition, petitioner challenges the reliability of Morales's identification and the closure of the courtroom

---

[1] Petitioner had an extensive criminal history, including prior convictions for robbery, escape and manslaughter. He had been released on parole in 1986.

during the testimony of an undercover police officer.

I. Trial Testimony

Lauree Johnson, Alan Sigman, Robert Williams, and Leslie Collins each witnessed portions of the crime from their respective apartments. From their different vantage points, they were able to observe certain physical characteristics of petitioner and his clothing. Johnson saw petitioner and his victim struggle from her second-story window above Hall Street. She described petitioner as either light Hispanic or white (Tr. 368), tall and thin, approximately five feet ten inches and one hundred and forty pounds, with wavy hair to the start of his neck, wearing a dark blue baseball cap, a dark blue zip-up hooded sweat jacket, dark jeans and light-colored sneakers (Tr. 374-75). Sigman, who also saw the struggle from his second-story window above Hall Street, described petitioner as having a slim build and wearing a cap with a brim in the front. (Tr. 313.) He was unable to otherwise describe petitioner's clothing or determine his race. When Williams stepped toward his sixth-floor window over Hall Street, after hearing screaming and a gunshot, he saw Wrappe hit the ground and saw petitioner running away. (Tr. 269.) He was able to see petitioner continue running down Willoughby Avenue (Tr. 272.). Williams described him as "of average height and weight" (Tr. 275), approximately five feet ten inches tall (Tr. 277), wearing a long-sleeved top and pants, both battleship grey or bluish-grey (Tr. 274). He was unable to determine petitioner's race, but told police officers that petitioner did not appear to be white because he was not able to see white arms, white skin or light hair. (Tr. 278, 281.) After Collins heard screaming and a shot (Tr. 342), he looked out his second-floor window over Willoughby Avenue and saw petitioner running down the middle of the street towards

3

Washington Avenue. (Tr. 344.) He described petitioner as white or Hispanic and wearing a windbreaker or sweatshirt with a hood. (Tr. 347.) Although Collins was not certain whether petitioner had the hood up, he said that petitioner's head may have been covered and that he thought petitioner was wearing a cap. (Tr. 347-48.)

Felipe Morales was walking on Willoughby Avenue at the time, looking inside cars for a radio to steal. (Tr. 75.) He saw petitioner running on Willoughby from Hall Street toward Washington Avenue (Tr. 78, 80), wearing a blue Mets baseball cap and a dark blue zip-up hooded sweat jacket. (Tr. 79-80, 95.) Morales was able to see him from about a foot away, and called out "What up, Frank?" when he recognized him. (Tr. 81-82.) Petitioner did not respond, but he dropped the dark-colored purse that he was carrying under his arm. (Tr. 83-84.) He ran back for the purse (Tr. 86), turned around his baseball cap in such a way that Morales saw his bald spot, and continued running towards Washington Avenue. (Tr. 87.) Morales then walked to Hall Street and approached Wrappe who was lying face-down in the street. (Tr. 89, 90.)

Johnson, Sigman and Collins each testified that they saw an Hispanic man on Hall Street just after petitioner fled. Johnson described him as "a young short Spanish guy" walking up Hall from the corner of Willoughby and Hall. (Tr. 376-77.) He was dressed in jeans and a jacket but did not look like petitioner because he was short and stocky. (Tr. 377-78.) Johnson positively identified Morales from photographs. (Tr. 377.) Other than noting that the Hispanic man he saw had a medium build, Sigman was unable to describe his appearance. (Tr. 311.) Collins was able to identify Morales from photographs as possibly being the Hispanic man he saw. (Tr. 349-50.)

All three also saw Morales approach or speak to the police when they arrived—Johnson

from her window, and Sigman and Collins from the street.[2] (Tr. 311, 350, 379.) According to Johnson, Morales appeared to be agitated and upset. (Tr. 379.) He was trying to give them information (Tr. 379-80), but they were "paying no attention to him." (Tr. 380.) Collins testified that he did not appear to be "irrational." (Tr. 351.)

Officer Angelo Martinez was one of the police officers who responded to the scene. (Tr. 226A-227, 239-40.) He briefly interviewed three people who were standing near the victim—two white males and a male Hispanic that he recognized from the neighborhood whose name he did not know and later learned was Morales. (Tr. 227, 229, 236, 240.) Martinez confirmed that Morales "appeared to be anxious, wanting to tell us something . . . ." (Tr. 230.) Morales gave a brief description of the man he saw running as a "male white wearing a blue sweatshirt with a hood and blue jeans" to Martinez before Martinez was called away to investigate a backyard disturbance for a possible suspect. (Tr. 228, 230, 241.) Martinez's notebook did not reflect that Morales named petitioner as the man he saw running, and Martinez had no recollection of whether Morales had given him a name. (Tr. 241.) When Martinez returned, Morales was gone. (Tr. 231, 241.) Martinez then went to Brooklyn Hospital to check on Wrappe. (Tr. 232, 242.) Wrappe died that morning. (Tr. 252.)

Hal Stucker, who was riding through the area on his motorcycle, also saw petitioner running down Willoughby Avenue toward Washington carrying a black bag. (Tr. 155.) Although Stucker initially told the police that petitioner was "a light skinned or coffee colored" Hispanic, "maybe white" (Tr. 162), he realized that because of orange tint in the street lights, he "couldn't

_____

[2] Both Sigman and Collins had left their apartments and were standing in the street near Wrappe when the police arrived. (Tr. 310, 349.)

5

say for sure" whether he had seen "coffee color skin" (Tr. 163). He described petitioner as five feet and eight or nine inches tall and very thin (Tr. 163), wearing white sneakers and light colored clothing, possibly a hooded sweatshirt or light jacket over a sweatshirt (Tr. 166). Stucker could only see petitioner's face from the nose down, but was able to describe him as having a long, narrow face with a long chin, maybe with some beard stubble on the chin or some facial hair. (Tr. 165.) He could not say whether petitioner was wearing a hood or hat. (Tr. 166.)

Despite the fact that Stucker was only "really" able to see petitioner's chin, and was only certain of the shape of petitioner's head, police prepared a sketch based on his description. (Tr. 172.) It is unclear from the record how the details of the sketch, which appeared in the newspapers, were filled in. Detective Paul Feddern testified that, on the basis of a "hunch" from the robbery unit, a neighborhood Hispanic male named Julio Vargas had been included in a photo array shown to Stucker at the time the sketch was done. (Tr. 646-47.) Stucker was unable to identify anyone from the array. (Tr. 175-76, 648.) The sketch was key to the defense's theory of misidentification because, as Morales agreed, it in fact resembled Morales more than petitioner. (Tr. 118.) Nevertheless, when Stucker was shown photographs of Morales at trial, he described Morales as "too square" and "too thick" to be the man he saw running. (Tr. 172.)

Morales testified that two days after the murder, Martinez found him on the street and questioned him further. (Tr. 116.) Morales provided the details of his sighting of petitioner, including that he knew and called out petitioner's name (Tr. 116-117), but then he resisted returning to the precinct and claimed that the information he had given was "made up"[3] (Tr. 109-

---

[3] Specifically, on cross, Morales testified that, after being shown the sketch, he did not tell the police that the man he saw was Frank, but instead he told the police that he "had made up about who [he] had seen and what [he] had seen." (Tr. 109.)

110). According to Morales, he did not want to go to the precinct because he was waiting to be paid for a stolen radio and wanted to buy drugs. (Tr. 110, 118.) Martinez showed Morales a copy of the police sketch prepared from Stucker's description. (Tr. 117.) Morales feared that he would be arrested because he thought the sketch looked like him and agreed to be interviewed. (Tr. 118.) Although Morales had never been in petitioner's house, he knew that petitioner lived on Washington between Myrtle and Park Avenues and that petitioner parked an old blue Honda in front of his house. (Tr. 96.) Morales could not remember whether he told Martinez on the night of the murder that the man he saw was Frank and did not recall having given Martinez a description of petitioner's appearance. (Tr. 103.) He also said that his conversation with Martinez that night was not long, and he did not have a chance to tell Martinez everything he knew before Martinez was called away. (Tr. 115.)

Martinez confirmed that two days after the murder he canvassed the area, found Morales, and talked with him further. (Tr. 237, 243.) He asked Morales to return with him to the precinct to meet with detectives (Tr. 238, 244), and Morales "showed some signs of fear." (Tr. 238.) Morales told Martinez he wanted to get high and that everything he had said was a lie. (Tr. 244-45.) Martinez "tried to show him that he [would] be doing the right thing in going to the 88 precinct" (Tr. 239) and "tried to show him that it would be vital and important for him to come"[4] (Tr. 244), and Morales ultimately went with him. (Tr. 239.) At the precinct, Morales was interviewed by detectives while Martinez listened. (Tr. 248.)

Based on Morales's information, petitioner was arrested the next day. (Tr. 403-404.) Police found him in a blue 1973 Honda Civic several blocks from his home. (Tr. 405.) Morales

---

[4] Martinez was not specifically questioned about having shown Morales the police sketch.

returned to the precinct to view a line-up and identified petitioner without hesitation. (Tr. 97, 112.) Morales admitted that while waiting to view the line-up, he left the precinct briefly to snort some heroin. (Tr. 97, 112-13.) He also admitted that he smoked crack on the night of the murder two hours before he saw petitioner running on Willoughby Avenue. (Tr. 75, 104).

Charles Brown was incarcerated at Rikers Island on a parole violation while petitioner was there pending trial. In order to avoid revealing to the jury that Brown knew petitioner from their prior incarceration at Green Haven Correctional Facility, petitioner stipulated at trial to their acquaintance. (Tr. 431, 506.) Brown testified that when the two first spoke at Rikers in July of 1989, petitioner admitted that he was "sick," "had to make some money," and had to "make a move." (Tr. 509.) According to Brown, petitioner told him that there was no case against him because "the gun they got is not the right gun. I broke mine up and threw it in the sewer. " (Tr. 510.) Petitioner also said "I'm going to trial with this." (Id.) John Bedron, deputy warden at Rikers Island, confirmed that although petitioner and Brown were in different segregated housing units, they would have had the opportunity to speak to each other. (Tr. 575-76.) Brown acknowledged that he expected to receive a favorable parole recommendation in exchange for his testimony (Tr. 497, 512-13) and that he contacted the trial prosecutor after reading a newspaper article about petitioner's case. (Tr. 512, 517-19.)

Alan Bensew, who was standing out on the corner of Washington and Willoughby Avenues for a couple of hours on the night of the murder, testified as a defense witness that he heard a gunshot and saw a man running from Hall Street down Willoughby Avenue. (Tr. 585.) Bensew described the running man as white or Hispanic, six feet to six feet one inch tall, one hundred and fifty to one hundred and sixty pounds, wearing dark pants and white sneakers, and

holding "something under his arm like a football." (Id.) His hair was dark and neatly trimmed,

he was not wearing anything on his head, and he was not bald. (Tr. 586.) Bensew could not see

the running man's face (id.), but he testified that petitioner was not the running man he saw. (Tr.

586-87). Bensew never spoke to the police. (Tr. 633-34.) He first contacted petitioner's counsel

approximately eleven months after the incident. (Tr. 634-35.)


## II. Post-Conviction History

Petitioner appealed his conviction, arguing: (1) he was denied his right to a public trial

because the courtroom was closed during the testimony of Officer Martinez, (2) the court's jury

charge was inadequate, (3) the evidence was insufficient and the verdict was not supported by the

weight of the evidence, and (4) the court abused its discretion in its Sandoval ruling. The

Appellate Division affirmed the conviction, finding that the courtroom closure was proper and

that petitioner's other claims were "either unpreserved for appellate review or without merit."

People v. DeChirico, 586 N.Y.S.2d 25 (App. Div. 1992). The New York Court of Appeals

denied leave to appeal, People v. DeChirico, 80 N.Y.2d 974 (1992), and the Supreme Court

denied certiorari. DeChirico v. New York, 507 U.S. 942 (1993).

By petition dated March 12, 1997, petitioner sought a writ of habeas corpus pursuant to

28 U.S.C. § 2254 on the sole ground that he was denied his right to a public trial. By order dated

June 12, 1997, this Court dismissed the petition as time-barred. Petitioner appealed, and the

Second Circuit vacated the dismissal and remanded the case for the reasons stated in Ross v.

Artuz, 150 F.3d 97 (2d Cir. 1998) and Joseph v. McGinnis, 150 F.3d 103 (2d Cir. 1998).

Thereafter, petitioner was appointed counsel, and counsel moved to amend the petition to

include a sufficiency of the evidence claim. As part of the sufficiency claim, petitioner submitted

the police reports of the initial interviews of Johnson, Sigman, Williams, Collins and Stucker,

and a map of the vicinity of the crime. Focusing on the interviews, and the fact that no one noted

that petitioner was wearing a cap at that time, counsel argued that Morales's description of

petitioner did not match. Counsel contended that Morales's inconsistent identification should

have been suppressed as inherently unreliable because of Morales's drug use and motive to avoid

arrest himself. Petitioner also challenged the reliability of Brown's testimony, raising

intertwined Brady and perjury claims based on proof, revealed during the Fama murder trial, that

Brown had offered fabricated information about a plot to kill District Attorney Robert

Morgenthau to the New York County District Attorney's Office at the time that he testified in

petitioner's case. As support, petitioner submitted unsettling, perhaps inflammatory, pieces

written by a local newspaper columnist at the time of the Fama trial that characterized Brown as

a notorious jailhouse snitch and purported to chronicle Brown's record of giving bogus

information to law enforcement. Petitioner sought discovery to explore whether the trial

prosecutor in his case failed to disclose such impeachment evidence in violation of Brady v.

Maryland, 373 U.S. 83 (1963) or knowingly presented false testimony in violation of Naupe v.

Illinois, 360 U.S. 264 (1959). This Court denied the request on the ground that the information

sought related to issues not yet raised and exhausted in state court. The petition was dismissed

without prejudice to allow petitioner to return to state court.

Petitioner moved pro se to vacate his conviction pursuant to New York Criminal

Procedure Law § 440.10. Petitioner submitted the memorandum he filed in support of his

withdrawn habeas petition, raising courtroom closure and sufficiency claims, as well as seeking

discovery. In opposition, the state argued that the courtroom closure claim was procedurally barred because it was rejected on the merits on appeal. Similarly, the state contended that to the extent petitioner had raised his sufficiency claim on appeal, the claim was procedurally barred because it had been rejected on the merits, and to the extent petitioner was raising a new challenge to the sufficiency of the evidence on the ground that Morales's identification testimony should have been suppressed, the claim was procedurally barred because it had not been raised on appeal. To the extent petitioner's claim was based on police reports and a map of the area, the state argued that the claim was barred because petitioner could have, with due diligence, made such materials part of the appellate record. The state also contended that no statutory authority existed for the discovery petitioner sought. By Order entered June 4, 2001, the New York Supreme Court denied the motion to vacate on the ground that "the issues raised were previously determined on the merits of the defendant's appeal, could have been raised on appeal, or are based on documents that could have been adduced with due diligence and made part of the record. The branch of the motion for discovery is denied as well." Leave to appeal was denied on August 7, 2001.

Petitioner renewed his petition pursuant to 28 U.S.C. § 2254 and his application for discovery. After additional letter briefing on the discovery issue, this Court directed counsel for petitioner to interview the trial prosecutor and directed respondent to locate and provide additional material related to Brown and his testimony at the Fama trial. In supplemental briefs, respondent continued to argue that petitioner failed to exhaust his Brady and perjury claims, despite his return to state court. Specifically, respondent contended that petitioner made only a post-conviction discovery request and failed to raise the claims as substantive grounds for

11

vacating his conviction. In the alternative, respondent argued that if petitioner's claims were adequately raised, they were rejected on the merits.

An evidentiary hearing was held by this Court on June 29, 2005, to address petitioner's Brady and perjury claims.

III. The Hearing

There were three witnesses at the hearing: petitioner, former Kings County Assistant District Attorney Andrew Dember, and former New York County Assistant District Attorney Stephen Barry. Testimony was presented to address the key issues underlying petitioner's Brady and perjury claims—whether Dember, the trial prosecutor, withheld impeachment material with respect to Brown's history as a cooperator, including his proffer of fabricated information to the New York County District Attorney's Office about a plot against District Attorney Robert Morgenthau, and whether Dember knew or should have known that Brown's testimony regarding his past cooperation and petitioner's admissions was perjured.

With respect to the latter, Dember confirmed, as Brown testified at trial, that Brown first contacted him after a newspaper article about petitioner's trial appeared on October 20, 1989—less than a week before testimony was to begin.[5] (Hr. 72-73.) Before deciding to use Brown as a witness, Dember conducted a "thorough interview" of Brown himself. (Hr. 56.) Dember also arranged for Detective Joseph Ponzi to administer a polygraph examination. (Hr. 54). Dember said he trusted Ponzi's "reputation" as "a true authority as not only a polygraph

_____

[5] Opening statements in petitioner's trial were made on October 23, 1989. Testimony began the following day.

12

expert and administrator of polygraph examinations, but . . . also [as having] a very high – very excellent reputation as an interrogator, interviewer." (Hr. 56). Ponzi also spoke directly with Queens Assistant District Attorney Peter Reese about that office's dealings with Brown and Brown's credibility. (Hr. 67.) In addition, Dember checked with New York State Corrections to corroborate Brown's claim that he and petitioner had met in the1980s at Green Haven while petitioner was serving a sentence for manslaughter, and he recovered a photograph from Brown's home of Brown, petitioner and other inmates there. (Hr. 59-60.) Dember also confirmed that Brown and petitioner were confined at Rikers Island with "access to one another" at "around the time" Brown claimed petitioner made the admissions to him. (Hr. 59.)

Petitioner denied making any admissions to Brown. (Hr. 35.) He also to denied ever having known Brown in the past (Hr. 31, 34), despite his stipulation to the contrary at trial (Hr. 40). He further claimed that the two were housed in separate segregated housing units at Rikers that never had access to each other. (Hr. 31.)

With respect to what Dember knew about Brown's dealings with the New York County District Attorney's Office, the circumstances surrounding two telephone message slips in Dember's file, which were not turned over to petitioner's trial counsel, were explored. The first is an undated slip indicating a call to Dember from Wayne Cooper with a return telephone number within the New York County District Attorney's Office; the second is a slip dated October 26, 1989, indicating a call at 12:45 from Steve Barry. (Hr. 13.) The first slip contains no additional message. The second slip identifies Barry as being from the Manhattan DA and includes a message to call back "regarding your wit Parker." There is no dispute that "Parker" was one of Brown's many aliases.

13

Dember confirmed that the New York County District Attorney's Office "initiated the conversation" and was "aware that there was some sort of relationship between Brown and [his] office." (Hr. 63.) In addition, he said that he must have returned the call from Barry that day or the next. (Hr. 65.) Dember recalled specifically that he had a "brief" conversation with a member of the New York County District Attorney's Office, although he could not remember with whom. (Hr. 62.) As to what was discussed, Dember testified as follows:

> All I remember them – the person from the DA's office telling me was that they were talking to [Brown] also. I was not told what they were talking to him about. I wasn't told, you know, how often or when they were talking to him, how often they had or – it seemed to me what I was being told they were continuing to talk to him, he had some information for them but I was never told what that information was . . . . My recollection is, I believe I told them something like we are talking to him and we are dealing with him on a case. I don't remember if I mentioned it was a murder case. I don't remember if I mentioned he had taken a polygraph and passed the polygraph. It is possible I did, but they weren't – I don't think either of us was getting into specifics of what Brown was telling the respective office.

(Hr. 63). This Court asked: "Do you recall any red flags going up?" (Hr. 64.) Dember responded:

> Not at all, just that he was talking to them also. Nothing. Not told anything about, again, what he was talking to them about, whether or not they believed what he was saying to them at the time. Nothing like that in the conversation.
>
> It was simply that we are talking – we are touching base, as Your Honor describes it and we are talking to him also. That really was it.

(Hr. 63-64.)

Barry confirmed during the hearing that Brown had told the New York County District Attorney that he had information about a contract on District Attorney Morgenthau's life. (Hr. 6-

7.) He could not, however, recall much about his contact with Brown or his investigation into the alleged murder plot. (Hr. 8-9.) He had no specific recollection that he called Dember. (Hr. 9.) Barry initially surmised that if he contacted Dember, it would have been to convey that he thought Brown had lied to him about the plot to kill Morgenthau. (Hr. 10.) He later admitted that, given the timing, he likely contacted Dember simply to check Brown's background. (Hr. 23.) Although Barry suspected that Brown's information was fabricated from the start (Hr. 14), the information was taken seriously and investigated. (Hr. 7, 19, 25.) The fact that the information was entirely false was not confirmed until October 30, 1989. (Hr. 25-26.) In the interim, Brown participated in four conversations taped by the New York County District Attorney's Office that appeared to corroborate the existence of the conspiracy. (Hr. 17-18.)

The jury returned its verdict in petitioner's case on November 1, 1989. Dember remained unaware that Brown gave false information to the New York County District Attorney's Office until April 1990, when he read about it in the press coverage of the Bensonhurst murder trial. (Hr. 68-69, 85). Had he known, he testified, he would not have called Brown at petitioner's trial and would not have appeared before the parole board on Brown's behalf in late November or early December of 1989 in exchange for his cooperation in petitioner's case. (Hr. 66-67.) At that appearance, Dember brought a letter from Reese on behalf of the Queens District Attorney's Office, dated November 28, 1989, describing the assistance Brown had given them in the investigation and prosecution of a 1985 homicide. (Hr. 67; see Resp't Ex. J.)

Two notes in Dember's file relating to Brown's general credibility that were not disclosed were also explored. The first is a handwritten note with the words "CC = Qns DA Office = do not trust." Beneath that, in a box, the note includes the name "Lt Franceschini," and below that,

connected by a line, the phrases "-bum info" and "-set up phony threat against himself." The second is a telephone message slip indicating a call from a Lieutenant Kelly to Dember on October 25 at 4:30 p.m. On the slip are notes written in Dember's hand which state: "re: CC - good in one case" and "-last thing???" and "-bad temperament/con man, has not given Lt. K bad info." (Hr. 75.)

Explaining these notes at the hearing, Dember testified that Franceschini had told either him or one of his investigators that Brown had given "bum info" and had set up a phoney threat against himself. (Hr. 76-77.) Dember also recalled that he was told that Franceschini had "no personal knowledge" of Brown and that he was directed to contact detectives in the Queens Homicide squad or their commanding officer Lieutenant Kelly. (Hr. 77.) Continuing to interpret his own notes, Dember testified that Kelly told him that Brown had given good information in one case, and that, although Kelly could not definitively say whether the information Brown last gave was truthful, Kelly did not know Brown to have given any bad information. (Hr. 79, 81.) Kelly also confirmed that, consistent with Brown's criminal record, he was a "con man." (Hr. 79.)

When asked whether the two notes or the information therein had been disclosed to petitioner's defense counsel in any form, Dember responded:

> I don't believe so. Detective – Lieutenant Frangisini's[sic] hearsay unsubstantiated allegations is what I was trying to . . . substantiate . . . . I was trying to get to the bottom of whether there was truthfulness or not. I didn't believe hearsay information, vague and general, I was getting either directly through that lieutenant or one of my investigators . . . instituted [sic] Giglio or Brady because I didn't believe that somebody simply saying he gives bum information, gave bum information without being specific, without being able to tell me what case, what information were you talking about and the fact that it was merely somebody's belief rather than based upon evidence or a particular case or a particular incident I don't believe was Giglio. My efforts were to find out whether

16

that was true or not.

(Hr. 80.)

## Discussion

I. Standard of Habeas Review

Pursuant to 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a writ of habeas corpus "shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication . . . resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. § 2254(d)(2). This Court may, however, deny claims on the merits that have not been properly exhausted in state court. 28 U.S.C. § 2254(b)(2).

"[C]learly established Federal law in § 2254(d)(1) refers to the holdings, as opposed to the dicta . . . as of the time of the relevant state-court decision." Williams v. Taylor, 529 U.S. 362, 412 (2000); Carey v. Musladin, 127 S.Ct. 649, 653 (2006). The Second Circuit has made clear that when a claim is rejected in state court as either unpreserved or without merit, the claim is presumed to have been adjudicated on the merits, and AEDPA deference to the state court adjudication applies. Jimenez v. Walker, 458 F.3d 130, 146 (2d Cir. 2006).

A state court decision is contrary to clearly established federal law if the state court applies a rule that contradicts governing Supreme Court precedent or the state court confronts a set of facts that are materially indistinguishable from a Supreme Court decision and arrives at a

different result. Williams, 529 U.S. at 413. A decision is an "unreasonable application" of federal law if the state court's application of governing Supreme Court precedent is objectively unreasonable. Id. at 409, 413; see also Mask v. McGinnis, 252 F.3d 85, 88-89 (2d Cir. 2001); Francis S. v. Stone, 221 F.3d 100, 109-11 (2d Cir. 2000). An erroneous application of federal law is not necessarily an unreasonable one. Williams, 529 U.S. at 410-11. Nevertheless, as interpreted by the Second Circuit, "although '[s]ome increment of incorrectness beyond error is required . . . the increment need not be great; otherwise habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence.'" Mask, 252 F.3d at 89 (quoting Francis S., 221 F.3d at 111).

Claims rejected on independent and adequate state procedural grounds cannot be reviewed by this Court absent a showing of cause for the default and prejudice therefrom, or that a fundamental miscarriage of justice will result. Coleman v. Thompson, 501 U.S. 722, 750 (1991). The fundamental miscarriage of justice exception applies only in the extraordinary case and has been explicitly tied by the Supreme Court to a petitioner's innocence. Schlup v. Delo, 513 U.S. 298, 321 (1995). Petitioner must demonstrate that he is actually innocent of the crime of conviction, and "[t]o be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence . . . that was not presented at trial." Id. at 324. To establish innocence, "[a] petitioner's burden . . . is to demonstrate that more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt" or "that more likely than not any reasonable juror would have reasonable doubt." House v. Bell, 547 U.S. 518, 538 (2006).

18

II. Sufficiency of the Evidence

Petitioner challenges the sufficiency of the evidence. Of all of the witnesses, only Morales positively identified petitioner as the man running on the block around the corner from the scene. Petitioner argues that Morales's identification was so inherently unreliable that it should have been suppressed and should not be considered by this Court in evaluating his sufficiency claim.

In attacking the reliability of the identification, petitioner points to Morales's admissions that he smoked crack two hours before he saw petitioner running on Willoughby Avenue and that he snorted heroin before viewing petitioner in the line-up. Petitioner also suggests that Morales was coerced into naming petitioner to clear himself. Specifically, he claims, contrary to Morales's testimony (Tr. 116-17) , that Morales gave two important details to the police—petitioner's name and the detail that petitioner had been wearing a baseball cap that he turned around, revealing his bald spot—only after they suggested that he himself might be arrested based on the police sketch. Petitioner raised essentially the same claims on appeal, arguing that the Morales's testimony was incredible, and therefore insufficient evidence of identity, and the claims were rejected. Petitioner now casts these same claims in terms of a failure by the trial court to correctly assess the reliability of the identification at the pre-trial Wade hearing and suppress the identification.

Petitioner bolsters his challenge to Morales's identification by calling into question the testimony of Johnson, Sigman and Collins with respect to whether petitioner was wearing a cap. Relying on notations in the police reports of their initial interviews on the date of the murder, which were not part of the state court record, counsel insinuates that these witnesses were

19

"somehow persuaded that, even though they never mentioned it before, they too had seen a baseball cap on the running man's head, just like Morales." (Pet. Memo., June 17, 1999, 17.) Counsel insists that she "do[es] not here contend that the witnesses were explicitly encouraged to falsify their testimony by claiming that the [petitioner] wore a hat," but only that "it is entirely plausible that, when preparing witnesses to testify with even the best-intentioned of leading questions, a prosecutor's suggestion may inadvertently become transformed into a witness' 'recollection' . . . . " (Id. at 17 n.15.)

Petitioner's claim as now articulated was presented to the state court in his § 440 motion, and it was expressly rejected on procedural grounds as a claim that could have been raised on appeal. As respondent argued before petitioner's return to state court and now reiterates, this Court cannot review the claim absent a showing of cause for the default and prejudice therefrom, or that a fundamental miscarriage of justice will result. Coleman, 501 U.S. at 750. Counsel's letter, dated September 7, 2001, addressing respondent's procedural arguments for denying relief, does not appear to address this default or make the required showing.

In any case, petitioner's claim fails. An identification must be excluded "only if the procedure that produced the identification is 'so unnecessarily suggestive and conducive to irreparable mistaken identification that [the defendant] was denied due process of law.'" United States v. Bautista, 23 F.3d 726, 729 (2d Cir. 1994) (quoting Stovall v. Denno, 388 U.S. 293, 302 (1967) (alteration in original), overruled on other grounds, Griffith v. Kentucky, 479 U.S. 314 (1987)). If the identification is independently reliable notwithstanding the unnecessarily suggestive procedure, it may be admitted. See Manson v. Brathwaite, 432 U.S. 98, 114 (1977) ("reliability is the linchpin in determining the admissibility of identification testimony"); see also

Raheem v. Kelly, 257 F.3d 122, 135 (2d Cir. 2001) (corrupting effect of suggestiveness must be weighed against factors indicating independent reliability); Bautista, 23 F.3d at 729-30 (even if procedure unnecessarily suggestive, identification admissible if sufficient indicia of reliability). Thus, due process requires that an identification be excluded "only if it was *both* produced through an unnecessarily suggestive procedure *and* unreliable." Bautista, 23 F.3d at 729 (emphasis in original). Neil v. Biggers, 409 U.S. 188 (1972), sets forth the factors to be considered in determining independent reliability. Manson, 432 U.S. at 114. They are:

> the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation.

Id.; see also Biggers, 409 U.S. at 199-200 (setting forth same factors).

In this case, nothing in the line-up identification procedure itself was suggestive. Morales waited in a separate room where he could not see petitioner or the fillers enter the station for the line-up (Wade Hr. 8, 10), and despite the fact that Morales left the precinct for a period before he viewed the line-up, petitioner made no showing that Morales improperly viewed petitioner or the fillers as a result (Tr. 22). Moreover, although not constitutionally required because the procedure was not suggestive, Jarrett v. Headley, 802 F.2d 34, 42 (2d Cir. 1986), there were independent indicia of reliability. Before the line-up was conducted, Morales gave a description to the police and told them that he knew the person he identified as Frank, that Frank's street name was white boy Frankie, and that he knew Frank lived on Washington Avenue. (Wade Hr. 14, 20.) In addition, the trial court rejected defense counsel's argument that Morales's drug use

provided a basis for finding his identification inherently unreliable.[6] (Tr. 20, 22.) The court's

determination that the identification was admissible was far from unreasonable.

The question of whether to credit Morales's identification was properly one for the jury to

decide. Both Morales's general credibility, and the impact of his drug use and motive to clear

himself on the reliability of his identification, were fully explored through direct and cross-

examination and argued on summation. Morales admitted that, at the time of trial, he was

serving a prison sentence for selling crack (Tr. 63), that he had been arrested numerous other

times for misdemeanor offenses (Tr. 67), and that he had used different names at different times

to "fool the system " (Tr. 107). He also admitted to using drugs, including using crack on the

night of the murder and heroin before viewing the line-up. (Tr. 68, 75, 98, 104, 112.) As to when

Morales named the running man he saw as Frank, and whether the timing suggested that he

named petitioner only when pressed to avoid his own arrest, Morales conceded on cross that he

could not remember whether he told the police on the night of the murder that the man he saw

was Frank and did not think that he had given a description other than that he had seen a man

running. (Tr. 103.) As noted in Brathwaite, "evidence with some element of untrustworthiness is

customary grist for the jury mill. Juries are not so susceptible that they cannot measure

_____

[6] As other district courts in this circuit have noted, drug consumption does not necessarily
negatively impact the ability of an eyewitness to make an identification. See Ayala v. Ercole, No.
06-1747, 2007 WL 1135560, at *9 (E.D.N.Y. April 17, 2007) ("[A]lthough the fact that four of
the eyewitnesses had been consuming alcohol and two had been smoking marijuana prior to the
shooting may impact the level of detail that they could have observed, consumption of alcohol or
drugs does not necessarily negate an eyewitness' attention to detail."); Gilbert v. Superintendent
of Collins Cor. Facility, No. 03-3866, 2004 WL 287683, at *9 (S.D.N.Y. Feb. 11, 2004)
(Considering whether identification was independently reliable, the court noted that although
witness had ingested alcohol and drugs earlier, he testified that he felt "normal, " and the
interviewing officer testified that he did not appear "high" later that night.).

intelligently the weight of identification testimony that has some questionable feature." 432 U.S.

at 116. Indeed, often "the *only* duty of a jury in cases in which identification evidence has been

admitted will . . . be to assess the reliability of that evidence." Watkins v. Sowders, 449 U.S. 341,

347 (1981); see also Dunnigan v. Keane, 137 F.3d 117, 129 (2d Cir. 1998) (citing Watkins).

When evaluating the sufficiency of the evidence, this Court must defer to the jury's

assessment of credibility. Maldonado v. Scully, 86 F.3d 32, 35 (2d Cir. 1996); see also Schlup,

513 U.S. at 330 (assessment of credibility of witnesses is generally beyond scope of review of

sufficiency claims). The Court must determine whether:

> viewing the evidence in the light most favorable to the prosecution,
> any rational trier of fact could have found the essential elements of
> the crime beyond a reasonable doubt. This familiar standard gives
> full play to the responsibility of the trier of fact fairly to resolve
> conflicts in the testimony, to weigh the evidence, and to draw
> reasonable inferences from basic facts to ultimate facts. Once a
> defendant has been found guilty of the crime charged, the
> factfinder's role as weigher of the evidence is preserved through a
> legal conclusion that upon judicial review all of the evidence is to
> be considered in the light most favorable to the prosecution.

Jackson v. Virginia, 443 U.S. 307, 319 (1979) (internal citation omitted). Thus, a petitioner

challenging the sufficiency of the evidence bears a heavy burden and is entitled to relief only if

"upon the record evidence adduced at the trial no rational trier of fact could have found proof of

guilt beyond a reasonable doubt." Id. at 324. Even the testimony of a single, uncorroborated

witness to a crime is generally sufficient. See United States v. Frampton, 382 F.3d 213, 222 (2d

Cir. 2004) (citing United States v. Danzey, 594 F.2d 905, 916 (2d Cir. 1979)).

Morales's drug use and self-interest impact only the weight of the evidence. They fall

short of rendering his testimony incredible as a matter of law. See Bonilla v. Portuondo, No. 00-

2369, 2004 WL 1782174, at *4 (S.D.N.Y. Aug. 9, 2004) (sole eyewitness's inconsistent

statements regarding whether he saw only smoke at the shooter's side or saw a gun, failure to mention the shooter's mustache or other facial details, and admission that he did not view the shooter until after he fell to the ground did not render testimony unbelievable as a matter of law.); United States v. Shulman, 624 F.2d 384, 388 (2d Cir. 1980) (resolution of credibility issues are generally exclusively for the jury, though "theoretically the testimony of a witness might be so incredible that no reasonable juror could believe him"). Accordingly, petitioner's sufficiency claim does not warrant habeas relief.

III. *Brady* and Perjury Claims

Petitioner claims that the prosecution failed to satisfy its obligations under Brady v. Maryland, 373 U.S. 83 (1963), and presented perjured testimony in violation of Naupe v. Illinois, 360 U.S. 264 (1959). Petitioner's Brady claim is largely based on the revelation during the Fama trial, six months after petitioner was convicted, that Brown gave false information to the New York County District Attorney's Office around the time of petitioner's trial. In addition, petitioner contends that the prosecution violated Brady by failing to disclose the notes in Dember's file regarding Brown's credibility and by failing to detail Brown's cooperation history as revealed at the Fama trial. With respect to the introduction of perjured testimony, petitioner primarily argues that the prosecution knew, or should have known, that Brown's testimony regarding petitioner's jailhouse admissions was false.

The parties disagree as to whether these claims were adequately presented in state court for purposes of exhaustion and whether they were ruled upon. See Daye v. Attorney General of the State of New York, 696 F.2d 186, 191-94 (2d Cir. 1982) (legal and factual premises of

federal claims must be set forth in state court to exhaust). This Court need not decide.

Petitioner's claims fail on the merits even applying a de novo standard of review. See Pratt v.

Greiner, 306 F.3d 1190, 1197 (2d Cir. 2002) (petition containing unexhausted claims may be

denied on the merits).


A. *Brady* Claims

To make out a Brady claim, evidence "must have been suppressed by the State" that is

"favorable to the accused" and "prejudice must have ensued." Strickler v. Greene, 527 U.S. 263,

281-82 (1999). Under Brady, "the suppression by the prosecution of evidence favorable to an

accused . . . violates due process where the evidence is material either to guilt or punishment,

irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. Evidence is

material, and prejudice is established, "if there is a reasonable probability that, had the evidence

been disclosed to the defense, the result of the proceeding would have been different." Kyles v.

Whitley, 514 U.S. 419, 433-34 (1995) (quoting United States v. Bagley, 473 U.S. 667, 682

(1985)). In such a case,

> [t]he question is not whether the defendant would more likely than
> not have received a different verdict with the evidence, but whether
> in its absence he received a fair trial, understood as a trial resulting
> in a verdict worthy of confidence. A "reasonable probability" of a
> different result is accordingly shown when the government's
> evidentiary suppression "undermines confidence in the outcome of
> the trial."

Id. at 434 (quoting Bagley, 473 U.S. at 678).

As set forth in Kyles:

> showing that the prosecution knew of an item of favorable
> evidence unknown to the defense does not amount to a Brady

> violation, without more. But the prosecution, which alone can
> know what is undisclosed, must be assigned the consequent
> responsibility to gauge the likely net effect of all such evidence and
> make disclosure when the point of "reasonable probability" is
> reached. This in turn means that the individual prosecutor has a
> duty to learn of any favorable evidence known to the others acting
> on the government's behalf in the case, including the police.

Id., 514 U.S. at 437. Moreover, "prosecutors can 'suppress' evidence by failing to search for

background information, such as a witness's criminal history, that is readily available through

routine investigation of the prosecution's files or the files of other government agencies."

Chandras v. McGinnis, No. 01-2519, 2002 WL 31946711, at *7 (E.D.N.Y. Nov. 13, 2002)

(citing Crivins v. Roth, 172 F.3d 991, 997-98 (7th Cir. 1999); Hollman v. Wilson, 158 F.3d 177,

181 (3d Cir. 1998); United States v. Brooks, 966 F.2d 1500, 1502 (D.C. Cir. 1992); United States

v. Auten, 632 F.2d 478, 481 (5th Cir. 1980) and United States v. Coppa, 267 F.3d 132, 140 (2d

Cir. 2001)). Although a "prosecutor is presumed, however, to have knowledge of all information

gathered in connection with his office's investigation of the case," United States v. Avellino, 136

F.3d 249, 255 (2d Cir. 1998), "knowledge on the part of persons employed by a different office

of the government does not in all instances warrant the imputation of knowledge to the

prosecutor, for the imposition of an unlimited duty on a prosecutor to inquire of other offices not

working with the prosecutor's office on the case in question would inappropriately require us to

adopt 'a monolithic view of government' that would 'condemn the prosecution of criminal cases

to a state of paralysis.'" Id. (quoting United States v. Gambino, 835 F.Supp. 74, 95

(E.D.N.Y.1993), aff'd, 59 F.3d 353 (2d Cir. 1995), cert. denied, 517 U.S. 1187 (1996)); see also

Morgan v. Salmack, 735 F.2d 354, 358 (2d Cir. 1984) ("A prosecutor is not constitutionally

obligated to obtain information dehors his files for the purpose of discovering information which

defense counsel can use in impeaching the credibility of a prosecution witness."). Furthermore, "the government has no Brady obligation to 'communicate preliminary, challenged, or speculative information.'" United States v. Amiel, 95 F.3d 135, 145 (2d Cir. 1996) (quoting United States v. Diaz, 922 F.2d 998, 1006 (2d Cir.1990)).

Impeachment evidence is material "if the witness whose testimony is attacked 'supplied the only evidence linking defendant(s) to the crime,'" United States v. Wong, 78 F.3d 73, 79 (2d Cir. 1996) (quoting United States v. Petrillo, 821 F.2d 85, 90 (2d Cir. 1987)), or "where the likely impact on the witness's credibility would have undermined a critical element of the prosecution's case." Id. (quoting United States v. Payne, 63 F.3d 1200, 1210 (2d Cir. 1995)); see also Boyette v. LeFevre, 246 F.3d 76, 93 (2d Cir. 2001) (undisclosed impeachment evidence material in one-witness identification case); Avellino, 136 F.3d at 256-57 (impeachment evidence considered material where witness supplied only evidence linking defendant to crime or where witness supplied only evidence of essential element of offense). Relief, however, "is generally not required when the testimony of the witness is 'corroborated by other testimony.'" Payne, 63 F.3d at 1210 (quoting Petrillo, 821 F.2d at 89). Moreover, "when the suppressed impeachment evidence merely furnishes an additional basis on which to impeach a witness whose credibility has already been shown to be questionable" it is cumulative and not material. Wong, 78 F.3d at 79 (quoting Payne, 63 F.3d at 1210); accord, e.g., Tankleff v. Senkowski, 135 F.3d 235, 251 (2d Cir. 1998) ("[W]hen a witness's credibility has already been substantially called into question in the same respects by other evidence," additional impeachment evidence is not material.); Avellino, 136 F.3d at 257 ("[W]here the undisclosed evidence merely furnishes an additional basis on which to challenge a witness whose credibility has already been shown to be

27

questionable or who is subject to extensive attack by reason of other evidence, the undisclosed evidence may be cumulative, and hence not material.").

Under these authorities, petitioner's <u>Brady</u> claim does not warrant habeas relief. Brown's report of a plot against Morgenthau was not known to be false when Dember spoke to the New York County District Attorney's Office on October 26, 1989, three days after opening statements in petitioner's trial, nor was it known to be false when Brown testified at petitioner's trial on October 27, 1989. The New York County District Attorney did not confirm that it was fabricated until October 30, 1989. Thus, this impeachment material was not even available to disclose to defense counsel when Brown was called as a witness. Indeed, Dember remained unaware that Brown gave false information through the time he appeared on Brown's behalf before the parole board in late November or early December of that year and until he read it in the press in April 1990.

In addition, Dember made significant efforts to investigate and verify the initial information he received about Brown's reputation reflected in the two notes in his file. Arguably, Dember was not constitutionally required to disclose these notes because they contained "preliminary, challenged, or speculative information.'" <u>Amiel</u>, 95 F.3d at 145; <u>but c.f.</u> <u>DiSimone v. Phillips</u>, 461 F.3d 181, 195 (2d Cir. 2006) (In addressing whether direct exculpatory evidence of questionable reliability constituted material favorable to the accused under <u>Brady</u>, the Second Circuit noted that, "it [is] the prerogative of the defendant and his counsel-and not of the prosecution-to exercise judgment in determining whether the defendant should make use of [the information]. To allow otherwise would be to appoint the fox as henhouse guard.") (citations omitted). Nevertheless, in hindsight, the better practice would have been to. <u>See</u> <u>United States v.</u>

28

Agurs, 427 U.S. 97, 108 (1976) ("[B]ecause the significance of an item of evidence can seldom be predicted accurately until the entire record is complete, the prudent prosecutor will resolve doubtful questions in favor of disclosure."); Kyles, 514 U.S. at 439 ("[A] prosecutor anxious about tacking too close to the wind will disclose a favorable piece of evidence.").

In any case, no Brady violation occurred. Even assuming that the prosecutor in this case was obligated to disclose his file notes relating to Brown's credibility and to further explore Brown's cooperation history and dealings with the New York County District Attorney's Office, there is no reasonable probability that the result of the proceeding would have been different had he done so. The zealous briefing of petitioner's counsel aside, a review of the testimony, as well as the prosecutor's summation, makes clear that petitioner's conviction rested squarely on Morales's identification of petitioner, not on Brown's report of petitioner's jailhouse admissions. The trial judge acknowledged the same when rejecting the state's request to charge manslaughter as a lesser included offense in the event that the jury credited Brown's testimony but not Morales's. The court specifically noted that if the jury were to disregard Morales's testimony, there would be "no case at all."[7] (Tr. 658.) Indeed, Morales's testimony itself, or the fact that the other trial witnesses' testimony corroborated his testimony, is referenced on nearly every page of the thirty-three page transcript of the prosecutor's summation. Clearly, Brown's testimony was neither the most significant evidence tying petitioner to the murder nor was it necessary to establish an element of any of the offenses of conviction. Thus, the additional impeachment

---

[7] In arguing for a manslaughter charge, Dember stated: "if [the jury] disbelieve[s] Morales and accept[s] Brown's testimony, they may not have enough evidence of the pocketbook being taken; they can disregard Morales' testimony, exclude him and accept Brown's testimony and from the admissions made by Brown, you have a shooting and nothing more." The trial court responded: "[i]f Brown doesn't corroborate Morales, there is no case at all." (Tr. 658.)

evidence in question is not material.

Moreover, the information is cumulative. The weaknesses in Brown's credibility were exposed by questions on half a dozen different grounds. He was thoroughly examined with respect to his current incarceration on a parole violation (Tr. 495); his exchange of his testimony in petitioner's case for a favorable parole recommendation (Tr. 497, 512-13); his drug use (Tr. 496-97, 516); his record of criminal convictions including two convictions for robbery (Tr. 496, 498-501, 519-21), as well as convictions for escape (Tr. 500), possession of stolen property (Tr. 504-5, 522) and sexual abuse (Tr. 502-3, 522); his use of false names when arrested (Tr. 505-06, 523, 526); his knowledge of newspaper reports of petitioner's case (Tr. 512, 517-19) and his having lied in the past for "different reasons" (Tr. 525). Brown was also questioned about the number of times he had previously cooperated and the favorable treatment he had received in exchange. [8] (Tr. 514-15, 523-24). Specifically, Brown testified that he had cooperated twice before—once in "a case in Queens" and once in a case referred only to as "finished." (Tr. 523.) The Court notes that the nature of the case referred to as "finished" was not revealed, and it remains unclear what case Brown was referring to.[9] The fact that Brown had testified in the

---

[8] With respect to Brown's past cooperation, the prosecutor revealed at the Massiah hearing: "I don't believe it's improper or it should prevent him from testifying, but I would not be forthright with anyone if I led anyone to believe that he's never, ever cooperated with law enforcement before. That would not be an accurate statement." (Tr. 486.) He emphasized again in discussing Brown's cooperation deal: "I don't want anybody to think this guy has never, ever cooperated with law enforcement before." (Tr. 489.) However, when defense counsel expressed his intention to question Brown about his past cooperation before the jury, the prosecutor expressed "concern about getting into specific names, specific cases because somebody is going to have their life in jeopardy." (Tr. 490.) To protect Brown's safety, defense counsel agreed to refrain from asking the names of the cases in which he had cooperated. (Tr. 490.)

[9] At the Cardona hearing in Fama, Brown admitted to offering information against four different people—Lorenzo "Fat Cat" Nichols, Frank DeChirico, Joseph Fama and a Mr.

"Queens" case as a jailhouse informant also was not brought out.[10]  Nevertheless, given the

nature of Brown's testimony at petitioner's trial and the many bases upon which Brown's

credibility was shown to be questionable, Dember's file notes and the additional impeachment

evidence that might have been developed had there been further inquiry into Brown's

cooperation history cannot "reasonably be taken to put the whole case in such a different light as

to undermine confidence in the verdict." Wong, 78 F.3d at 79 (quoting Kyles, 514 U.S. at 435).


B. Perjury Claims

Where perjured testimony has been introduced at trial, absent the prosecution's

knowledge, due process is violated only if "the testimony was material and 'the court [is left]

with a firm belief that but for the perjured testimony, the defendant would most likely not have

been convicted.'" United States v. Wallach, 935 F.2d 445, 456 (2d Cir. 1991) (quoting Sanders v.

Sullivan, 863 F.2d 218, 226 (2d Cir. 1988)); accord Ortega v. Duncan, 333 F.3d 102, 108 (2d

Cir. 2003).[11]  As a threshold matter, petitioner must demonstrate that perjury was in fact

committed. See United States v. Torres, 128 F.3d 38, 49 (2d Cir. 1997); United States v. Moore,

---

Edmunson. (Resp't Ex. A, Tr. 56-57.)  The information against Edmunson was offered in
February 1990. (Id. at 62.)

[10] In contrast, at the Fama trial, Brown was questioned about his having testified twice
before as a jailhouse informant in highly publicized cases—once in the Queens case against
Lorenzo "Fat Cat" Nichols and once in petitioner's case, also known as the Pratt case. (Resp't
Ex. B, Tr. 370-84.)  At the time of petitioner's trial, however, had Brown been similarly
questioned, he would have testified to having been a jailhouse informant only once before.

[11] Although the availability under AEDPA of habeas relief in the complete absence of
prosecutorial knowledge has been called into question, see Drake v. Portuondo, 321 F.3d 338,
345 & n.2 (2d Cir. 2003) , this standard was applied by the Second Circuit in Ortega to a perjury
claim that had not been adjudicated by the state court. 333 F.3d at 108.

54 F.3d 92, 99 (2d Cir. 1995); <u>United States v. White</u>, 972 F. 2d 16, 20 (2d Cir. 1992). Specifically,

> [a] witness commits perjury if he gives false testimony concerning a material matter with the willful intent to provide false testimony, as distinguished from incorrect testimony resulting from confusion, mistake, or faulty memory. See <u>United States v. Dunnigan</u>, 507 U.S. 87, 94 (1993). Simple inaccuracies or inconsistencies in testimony do not rise to the level of perjury. See <u>United States v. Sanchez</u>, 969 F.2d 1409, 1414-15 (2d Cir.1992).

<u>United States v. Monteleone</u>, 257 F.3d 210, 219 (2d Cir. 2001).

Where "undisclosed evidence demonstrates that the prosecution's case includes perjured testimony and that the prosecution knew or should have known of the perjury," a strict standard of materiality applies. <u>Agurs</u>, 427 U.S. at 103-04. Relief is warranted "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." <u>Id.</u>; <u>accord</u> <u>Wallach</u>, 935 F.2d at 456; <u>Drake</u>, 321 F.3d at 345. Undisclosed "impeachment evidence may satisfy the 'reasonable likelihood' standard where a conviction depends on the testimony of a single government witness, or on a witness whose credibility was not attacked on cross-examination." <u>Wong</u>, 78 F.3d at 82 (internal citation omitted). Nevertheless, "where independent evidence supports a defendant's conviction, the subsequent discovery that a witness's testimony at trial was perjured will not warrant" relief. <u>Id.</u>; <u>c.f.</u> <u>Wallach</u>, 935 F.2d at 457 (conviction reversed where witness was "centerpiece" of government's case, and had jury learned witness lied under oath, his entire testimony may have been rejected).

Petitioner contends that Brown committed perjury when he testified to petitioner's jailhouse admissions. In the face of the photograph showing petitioner and Brown together at Green Haven and Bedron's uncontroverted trial testimony that inmates in petitioner's and

Brown's segregated units at Rikers had the opportunity to mingle with each other, petitioner now claims that he never knew Brown and that the two never could have spoken at Rikers. The Court acknowledges that jailhouse informants generally have compelling interests in cooperating with law enforcement and strong motives to lie. Nevertheless, petitioner has for a second time failed to offer any evidence to support his claim. His belated, self-serving assertions are not an adequate basis for this Court to conclude that Brown's testimony constituted perjury.

Petitioner also argues that Brown's account of the number of times he previously cooperated —"not more than two" (Tr. 491)—constituted perjury. Specifically, petitioner points to Brown's failure to include his contemporaneous offer of fabricated testimony to the New York County District Attorney's Office as a third instance of cooperation when he testified at petitioner's trial. In addition, petitioner argues that Brown's testimony that he was housed in a segregated unit at Rikers because he "was a witness of a murder of a police officer" (Tr. 514) was false. Petitioner cites Brown's testimony at the Fama trial that he had been a witness against Lorenzo "Fat Cat" Nichols as to jailhouse statements Nichols made about the murder of a parole officer, and not as to the murder itself (Resp't Ex. A, Tr. 56-57, 379-83). Both of these minor inconsistencies easily fall with in the category of incorrect testimony resulting from confusion or mistake. In the first instance, Brown was asked how many times he testified or gave information"prior to [petitioner's] case." (Tr. 491) (emphasis added). In the second, Brown's testimony can be construed to mean that he was a witness in a case of a murder just as easily as it can be construed to mean that he was a witness to a murder. Regardless, there is no reasonable likelihood that these statements as to collateral matters, even if false and known to be so by the prosecution, could have affected the judgment of the jury.

IV. Courtroom Closure

On appeal, petitioner claimed the trial court improperly closed the courtroom during the testimony of Officer Martinez. The claim was denied on the merits. Accordingly, this Court's review is limited under AEDPA. Because the state court's determination was neither contrary to nor an unreasonable application of Supreme Court precedent, nor based on an unreasonable determination of the facts, habeas relief is denied.

The trial court held a closed hearing at which Martinez testified that he was currently assigned as an undercover officer to the Brooklyn North Tactical Narcotics Team and that he had been assigned to that position for approximately three weeks. (Tr. 180-81.) He had a three-month initial assignment, but he planned to work as an undercover for the remaining seventeen years of his career. (Tr. 182.) At the time of trial, Martinez had made approximately fifteen undercover narcotics purchases that had resulted in arrests. (Tr. 181.) He had testified before the grand jury, but none of his cases had yet gone to trial. (Id.) Martinez confirmed that he felt that testifying in an open courtroom would threaten his safety, that it was important to his safety that he not be known to the public in the areas in which he operated as an undercover, and that undercover operations were dangerous and often involved dealing with persons armed with weapons. (Tr. 182-83.) He also testified that his identity as an undercover was not yet public knowledge and that he felt that testifying in an open courtroom would prevent him from operating effectively as an undercover. (Tr. 183.)

The trial judge considered whether the safety risk to Martinez could be eliminated by not disclosing his undercover status (Tr. 186), but ultimately decided to close the courtroom (Tr. 188). The judge noted that, to a certain extent, Martinez's safety was in jeopardy regardless of

34

the closure because he was operating as an undercover in an area that included the area in which he had previously been a uniformed police officer. He commented that "his name is clearly known, and everybody knows who he is, as he would be if there were an open courtroom. And if anything happens, it's not on my head, it's on theirs." (Tr. 188.) The courtroom remained sealed, the jury was brought in and Martinez testified.

As set forth above, Martinez recounted that he responded to the scene on the night of the murder, that he had brief contact with Morales at the time, and that Morales gave him an initial description of petitioner. He also testified that he picked up Morales two days later, and he confirmed some of the details of their interaction, including that Morales resisted returning to the precinct, that he was afraid, and that he wanted to get high and said that had lied. Martinez did not interview Morales at the precinct.

The right to a public trial, guaranteed by the Sixth Amendment, may be limited. Under Waller v. Georgia, 467 U.S. 39 (1984), courtroom closure is permitted when "the party seeking to close the hearing . . . advance[s] an overriding interest that is likely to be prejudiced, the closure [is] no broader than necessary to protect that interest, the trial court . . . consider[s] reasonable alternatives to closing the proceeding, and . . . make[s] findings adequate to support the closure." Id. at 48. With respect to the first Waller factor, the Second Circuit has held that:

> [T]he trial court must "require persuasive evidence of serious risk to an important interest in ordering any closure." It is true that an officer's undercover status will not in itself support closure of the courtroom during his testimony. At the same time . . . "the more extensive is the closure requested, the greater must be the gravity of the required interest and the likelihood of risk to that interest." That positive correlation works in both directions. [Where] the closure [is] brief and the testimony given during closure [is] merely corroborative[,] the State's burden . . . [is] not a heavy one . . . .

Brown v. Kuhlmann, 142 F.3d 529, 538 (2d Cir. 1998) (quoting Ayala v. Speckard, 131 F.3d 62, 70 (2d Cir.1997)).

The Appellate Division found the closure to be proper, specifically noting that: "[a]t a hearing on the . . . application for closure, the officer testified that he was still working in an undercover capacity and that his personal safety in the same geographical area where the defendant was arrested would be jeopardized if his identity as a police officer were revealed." DeChirico, 586 N.Y.S.2d at 26. Its determination that closure was proper was not unreasonable.

Martinez was not an essential witness in the case. His testimony covers twenty-seven pages of the over seven hundred pages of trial transcript, not including the jury charge, and less than half the fifty-eight pages of testimony from Morales.[12] Like Brown v. Kuhlmann, and Bobb v. Senkowski, 196 F.3d 350 (2d Cir. 1999) (per curiam), petitioner's case is not the typical case involving courtroom closure, where the undercover officer that testifies is the central witness in a "buy and bust." Rather, Martinez's testimony was more "corroborative" in nature, serving to confirm the details of his interactions with Morales and certain aspects of the police investigation, as opposed to directly implicating petitioner in the crime. See id. at 354. (where extensive undercover investigation involved several officers, single officer's testimony was corroborative); Brown, 142 F.3d at 538 (testimony of second officer regarding issue of defendant's use of same alias during previous arrest was "merely corroborative").

Given the brevity of the closure and the nature of Martinez's testimony, the state court's determination that the prosecutor met his burden was not an unreasonable application of Waller.

---

[12] The courtroom was also sealed during the closure hearing, covering approximately eight pages of the trial transcript (Tr. 180-88), and during the marking of certain photographs in evidence, covering approximately five pages of the trial transcript (Tr. 189-205).

That Martinez had worked in the same area as a uniformed policeman prior to going undercover, putting him at risk regardless of the closure as noted by the trial court, does not undermine his safety concerns to the point of rendering the closure unreasonable. See Brown v. Artuz, 283 F.3d 492, 501-02 (2d Cir. 2002) (despite officer's dual status as both a non-undercover arresting investigator and an undercover in certain areas, closure did not involve an unreasonable application of Waller); see also Brown, 142 F.3d at 538 (where closure was brief and testimony was corroborative, "limited likelihood that undercover officer's safety would be prejudiced . . . had sufficient weight in the balance").

With respect to the remaining factors, the state court's application of Waller was also not unreasonable. The courtroom was sealed only during the closure hearing and Martinez's testimony. Petitioner made no request that his family be allowed to remain. Thus, the closure was no broader than necessary. See Brown, 142 F.3d at 538 (closure not overly broad where only during brief testimony and no request made to allow family to attend); see also Rodriguez v. Miller, 499 F.3d 136, 143-44 (2d Cir. 2007) (circuit precedent requiring greater showing to justify exclusion of defendant's friends and family does not constitute "clearly established Federal law" and cannot be basis for granting writ). The transcript of Martinez's trial testimony was made available to the public and the press (see Tr. 189-201), "a reasonable alternative to open-court testimony." Brown, 283 F.3d at 502. And finally, the record testimony and the judge's findings regarding Martinez's safety were adequate to support the limited closure. See Brown, 142 F.3d at 538 (trial judge's reasons for finding officer's fear reasonable were adequate to support the limited closure although they were "neither entirely accurate nor particularly compelling").

## Conclusion

The application for a writ of habeas corpus is denied, and the petition is dismissed.

Because petitioner has not "made a substantial showing of the denial of a constitutional right," 28

U.S.C. § 2253(c)(2), a certificate of appealability shall not issue. In addition, this Court certifies

pursuant to 28 U.S.C. § 1915(a)(3) that any appeal would not be taken in good faith. <u>Coppedge v.</u>

<u>United States</u>, 369 U.S. 438 (1962). The Clerk of the Court is directed to close this case.

SO ORDERED.

Dated: Brooklyn, New York
      March 31, 2008

                    s/ Judge Raymond J. Dearie

                    RAYMOND J. DEARIE
                    United States District Judge